# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **DENIS RIVERA,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00156 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **VIRGINIA DEPARTMENT OF** | ) | By: James P. Jones |
| **CORRECTIONS, ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Denis Rivera, Pro Se Plaintiff; John Michael Parsons, Office of the Attorney General, Richmond, Virginia, for Defendants.*

The plaintiff, Denis Rivera, a Virginia prison inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Rivera asserts constitutional challenges to certain classification procedures that have allegedly prevented him from earning his release from the highly restrictive living conditions at Red Onion State Prison ("Red Onion"). After review of the record, I conclude that the defendants' Motions for Summary Judgment must be granted.

## I.

Rivera is currently serving a total sentence of thirty-six years, ten months, and twenty-two days in the Virginia Department of Corrections ("VDOC") for crimes that include malicious wounding, use of a firearm, and mayhem/maiming. He is also subject to a detainer based on a life sentence he received for a federal,

gang-related murder conviction. Rivera was first incarcerated at Red Onion in 2004 and, except for brief periods, has been confined there since that time.

Red Onion and Wallens Ridge State Prison ("Wallens Ridge") house all VDOC "Level S" inmates. Level S is reserved for inmates who must be managed in a segregation setting.[1] Under current policies, once a VDOC inmate is classified as Level S, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 10-35, ECF No. 82-1.) This OP became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The step-down program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the

---

[1] According to the VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2(IV)(G).)

procedure, they are rewarded by moving to the next step and earning its additional privileges.

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." (OP 830.A(III).) The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*)

Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id.*) On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that

harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive.

> Intensive Management (IM):
> IM-0
> IM-1
> IM-2
> IM-SL6
> Special Management (SM):
> SM-0
> SM-1
> SM-2
> SM-SL6
> Step-Down—Level VI General Population
> Structured Living—Phase 1 and Phase 2
> Security Level V General Population

The step-down program in OP 830.A is a so-called cognitive program that includes pro-social goals and requires the inmate to complete a workbook set called the *Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it.

All Level S inmates in the IM and SM categories are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles

and escorted by two officers whenever they leave their cells. Per policy, they receive meals in their cells (the same types of meals that inmates in general population units receive), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates generally can have two twenty-minute phone calls per month, one one-hour, non-contact visit per week, limited use of radio and television, and limited commissary purchases. They can possess at least two library books per week, receive and send mail, and possess legal and religious materials. The privileges an IM inmate may earn under OP 830.A at IM-1 and IM-2 include more library books per week, more commissary purchases, more non-contact visits or telephone calls, increased TV time and channels, and even limited job possibilities.

IM or SM inmates who do not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to a lower step. Some inmates assigned to a lower step may be required to start over with the *Challenge Series*; they must then work with treatment staff to complete its exercises again to achieve positive changes in thought processes and social skills. An inmate's refusal to participate in the step-down program may also be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain, stripped of the privileges he had earned in the higher step, until he chooses to participate.

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. (OP 830.A(IV)(D).)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings. (*Id.*)

Inmates in the SL6 step-down pod may progress through two phases.[2] In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells

---

[2] In addition to the SM-SL6 step-down pod, inmates at this stage may be assigned to: (a) the secure allied management ("SAM") pod, designed for inmates who may be vulnerable to victimization because of cognitive impairment or other factors; or (b) the

unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants. (*Id.*) Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, have outside recreation with other inmates for an hour, twice a week, and can walk to meals with other inmates to eat their meals together in the dining hall.

The IM pathway under OP 830.A is different than the SM pathway. If an inmate reaches IM-2 status, and officials determine that he cannot progress to the SM steps toward classification to the SL6 pods, he can become eligible for assignment to the lowest security level for an IM status inmate: Level 6-IM, also known as the Closed Pod. The Closed Pod is expressly designed "to create an opportunity for an increased quality of life for offenders possibly facing a long term in high security."[3] (OP 830.A(IV)(G)(1).) Closed Pod inmates continue to

---

secure integrated pod ("SIP"), designed for inmates who intentionally commit multiple minor disciplinary infractions to stay in segregated housing. The programming in the SAM and SIP pods differs from the step-down pod and is intended to assess inmates' ability to socialize safely with other inmates and encourage them toward a move to a general population.

[3] OP 830.A(IV)(G)(2)(g) states:

Restricted freedoms and interaction with staff and other offenders for the IM population is temporary. There is a strong commitment to develop a model to support an improved quality of life and greater opportunities for self-improvement for this dangerous population. The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others. However, at the time

have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts. Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and longer in-person visitation.

In addition to the weekly progress ratings by the Unit Management Team, OP 830.A(IV)(K)(5) requires that all segregation inmates, including those participating in the step-down program, be routinely reviewed by the Institutional Classification Authority ("ICA"). (OP 830.1 at 36-53, ECF No. 82-1.)[4] According to OP 830.A, Appendices F and G, Level S inmates are to receive an ICA review at least every ninety days. Among other things, the ICA reviews and acts on recommendations for step increases or reductions.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this

_____

of this writing, guidelines or models are not available for predicting safety with a population that has a proven history of carrying out extreme and/or deadly violence. Once the larger Step-Down plan in general is implemented and stable, attention will be focused on additional IM step-down opportunities.

[4] The defendants have submitted two copies of OP 830.1: one effective June 1, 2011, and the other effective June 1, 2014.

multi-level review scheme, according to OP 830.A(IV)(K)(1)(a), "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1(IV)(G), all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access.

Rivera arrived at Red Onion in early 2004, when he was twenty years old. At that time, he had more than thirty-six years to serve on Virginia convictions, followed by a life sentence in federal prison for a gang-related murder. Upon his arrival, Red Onion officials placed him in segregation, and he was housed in a single cell with access to religious and educational television programming. From July 2004 to July 2005, Rivera was confined in jail facilities in eastern Virginia for additional federal trial proceedings. While he was in these jails, he was not in segregated confinement. He could come and go from his cell without restraints or escorts, go to the gymnasium or outside to play basketball, go to the law library and the dining hall, and have contact visits.

Upon completion of the federal trial, Rivera was returned to VDOC custody to complete his state sentences and was transferred back to segregation at Red Onion. In August 2006, the warden reviewed Rivera's status, found that he was

"not viewed as a threat to institutional safety at this time," and assigned him to Progressive Housing, a setting Rivera refers to as "[g]eneral [p]opulation." (Pl.'s Counteraff. ¶ 7, ECF No. 88; Ex. 4 at 6, ECF No. 88-1.) Soon after, Rivera was found guilty of a disciplinary offense and was returned to segregation.

The VDOC changed its policies on inmate security levels in 2007, and Red Onion was designated for inmates assigned to long-term administrative segregation. Its Progressive Housing program served to help inmates transition from segregated confinement to a general population setting and, if otherwise eligible, to lower security institutions. Rivera was moved to Progressive Housing in May 2008. A disciplinary offense, which Rivera alleges was based on false accusations, sent him back to segregation within a few months. In June 2009, Rivera was reassigned to Progressive Housing, Phase I, and he soon progressed to Phase II. In this setting, he had a cell mate, came and went from his cell without restraints, and enjoyed recreation and meals with other inmates. Sometime in 2010, another disciplinary infraction, which Rivera again alleges was a false charge, put him back in segregation for a time. When he returned to Progressive Housing Phase I, Rivera talked to then-warden Tracy Ray, who allegedly told Rivera that he did "not want to lock him up no more" and that he wanted to transfer Rivera to a lower security level prison. (Pl.'s Counteraff. ¶ 16, ECF No. 88.)

Rivera restarted Phase II in May 2011. His counselor told him that because of his gang affiliation, he would have to complete six months in Phase II, instead of three months. When six months had passed, Rivera filed a grievance regarding his lack of transfer. During the grievance proceedings, in early December 2011, a disciplinary charge for threatening an officer, which Rivera alleges was a false charge, sent him back to segregation.

In February 2012, after a new warden was assigned to Red Onion, Progressive Housing became known as Structured Living. Rivera, however, remained in administrative segregation. In March 2012, the ICA found this housing assignment appropriate for him because of his recent disciplinary infractions. Then, in May 2012, the ICA concluded that administrative segregation was appropriate for Rivera "[d]ue to [the] serious nature of [his] crime and notoriety in addition to poor institutional adjustment." (Pl.'s Counteraff., Ex. 26 at 14, ECF No. 88-2.)

Rivera accrued two more disciplinary infractions in March 2012, which he claims were minor and false, and he was penalized with loss of his telephone and electronics privileges for 120 days. In July 2012, he learned from his counselor that he had been assigned to IM-1 under the then-current version of the Step Down Procedures, and his counselor explained how he could progress through the stages of the IM pathway. When his status was reviewed in October and December 2012,

-11-

the ICA found that the IM pathway continued to be appropriate for him, although he was progressed to IM-2 at some point. During this time, Rivera worked on the *Challenge Series*, despite his complaint that its contents had no relevance to him because he had never abused drugs or alcohol.

In March 2013, the ICA continued Rivera in administrative segregation under OPA 830.A based on his two disciplinary infractions from March 2012 and a third disciplinary conviction from December 2012 related to a use of force incident.[5] Rivera claims that although he remained at IM-2 status during 2013, ICA documents and grievances often misstated his status as IM-1, and he complains that reviewers failed to timely provide him with copies of ICA documents.

On August 27, 2013, the ICA reviewed Rivera's status and recommended a security level reduction from Level "S" to Level 6, also called the IM-SL6 Closed Pod. Further reviews in October 2013, January 2014, and February 2014 resulted in Rivera's continued assignment to the Closed Pod. After his annual review on February 12, 2014, the ICA recommended that Rivera's Good Time earning level be increased to Level 1, the highest earning level. In making this recommendation,

---

[5] Rivera filed a civil rights action against the officers involved in the December 2012 incident, and this court found in his favor after a bench trial and awarded him $500 in damages. *See Rivera v. Dickenson*, No. 7:14CV00573, 2016 WL 2642252 (W.D. Va. May 9, 2016), *appeal dismissed*, No. 16-6793 (4th Cir. July 12, 2016).

the ICA noted that Rivera had completed the *Challenge Series*, was enrolled in Anger Management, and had been charge free since December 28, 2012.

Rivera remained in the Closed Pod until March 12, 2014, when he was placed in pre-hearing detention, or segregation, pending the outcome of two disciplinary charges. One charge was for possession of a weapon — a razor blade that Rivera claims was planted in one of his books — and the second was for threatening bodily harm. Although the latter charge was dismissed, Rivera was convicted of possessing a weapon. His status was subsequently reduced to IM-0, which caused him to lose access to his television and other electronics.

At Rivera's housing status review on May 29, 2014, he asked to be transferred to a lower security facility. The ICA recommended that he remain in segregation for a longer period of stable adjustment due his recent charges. At his review on August 18, 2014, Rivera asked to be transferred to a Level 4 institution based on his institutional record. The ICA recommended that he remain in segregation, stating that he needed to participate in the *Challenge Series* program and remain charge free. However, it did recommend, and administrators approved, a status change to IM-1. After subsequent ICA reviews in November 2014, January 2015, February 2015, and April 2015,[6] Rivera remained in IM-1. When he filed grievances about his IM-1 status, an officer responded that privilege statuses

---

[6] Rivera alleges that he refused to sign the notice of the ICA hearing held on April 20, 2015. The hearing was held in his absence.

under OP 830.A were not grievable. Although Rivera had completed the *Challenge Series* previously, he was required to complete the entire series again.

On July 6, 2015, the ICA reviewed Rivera's status and recommended a change to IM-2. At his ICA review on October 2, 2015, Rivera again requested a transfer to a lower security facility based on his institutional record. The ICA denied his request, noting that Rivera was starting book six of the *Challenge Series* and that upon completion of the seven-book series, he would be considered for advancement. On November 5, 2015, the External Review Team reviewed Rivera's status and recommended no change at that time. On December 3, 2015, the ICA recommended that Rivera remain at IM-2 pending the completion of the *Challenge Series*. On January 14, 2016, however, the Unit Management Team recommended that Rivera be reduced from IM-2 to IM-1 due to a recent disciplinary charge for unauthorized transfer of property.

After his annual review on February 1, 2016, and a housing status review on February 10, 2016, Rivera remained at IM-1 status because he had not completed the requirements necessary for a step change. That same month, Rivera incurred a disciplinary conviction for unauthorized use or abuse of the telephone by calling the Prison Rape Elimination Act ("PREA") hotline and making allegations that were not PREA-related. In May 2016, he incurred another infraction for

disobeying a direct order when he refused to utilize the Bluetooth headphone device during a telephone call as ordered.

After a review of Rivera's housing status on May 13, 2016, the ICA deemed his IM-1 status appropriate because he had not met the Step Down Program requirements, which include remaining charge free. The ICA also informed Rivera that he had been removed from programming for disciplinary reasons and that he needed to re-enroll and complete the programs. On May 26, 2016, Rivera's status dropped from IM-1 to IM-0. Then, on June 30, 2016, the Unit Management Team reviewed Rivera's housing status and instructed that he remain in IM-0 due to his refusal of programs.

Liberally construed, Rivera's verified § 1983 Complaint asserts claims that application of OP 830.A as to him has unfairly prolonged his confinement under segregation conditions without federally required procedural protections, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that those conditions themselves have violated the Eighth Amendment's prohibition against cruel and unusual punishment. Rivera sues VDOC administrators for signing OP 830.A into effect and failing to correct the alleged constitutional violations. He also sues supervisory and treatment officials at Red Onion for the undesirable conditions and for improperly making or failing to correct the allegedly unfair classification decisions imposed on him under OP

-15-

830.A without sufficient due process. Rivera seeks monetary damages and injunctive relief to abolish OP 830.A and alleviate harsh conditions at Red Onion.

In Rivera's seventy-seven-page Counteraffidavit and over eight hundred pages of exhibits, filed in response to the defendants' Motion for Summary Judgment,[7] he alleges that OP 830.A discriminates against IM inmates, because SM status inmates who complete the *Challenge Series* can work their way to general population, but IM status inmates who complete the same series can only progress to the IM Closed Pod under continued segregation conditions; that officials arbitrarily assigned him to IM status without allowing him to be present or offer argument, contradictory testimony, witnesses, or evidence; that review between the various IM and SM steps is not meaningful; and that spiteful officers can falsely report poor behavior, fail to accurately record his participation in programming, or bring false disciplinary charges, thus preventing his progress to the next step. Rivera also complains that under OP 830.A, he has been unable to earn good conduct time and that many aspects of this policy are inconsistent with other VDOC policies.

---

[7] Rivera initially filed a fifty-five-page Counteraffidavit and over one hundred exhibits, but he has now moved to amend to expand the Counteraffidavit and add more exhibits. (Pl.'s Mot. to Attach, ECF No. 89; Pl.'s Mot. to Attach, ECF No. 90; Pl.'s Mot. to Supplement, ECF No. 91.) I will grant these motions and have considered these additional documents.

-16-

Rivera contends that his past success in general population housing assignments proves that he is wrongfully assigned to IM status, with the IM Closed Pod as the least restrictive housing assignment he can achieve in the VDOC. His submissions complain about the restrictive conditions IM status inmates face in the Closed Pod: being guarded by officers in shank proof vests, with dogs and gun posts ever present; having almost no out-of-cell activity without full restraints; having no access to a gym, a normal recreation yard, a law library or dining hall, a job outside the pod, or contact visits without being shackled to a chair; having to change cells every ninety days; and having no contact with inmates in other housing assignments.

Rivera contends that these conditions in the Closed Pod discourage him from working through the Step Down Program requirements.[8] He asserts that his IM status was arbitrarily assigned and prevents him from ever leaving administrative segregation, a status not warranted by his institutional record. Rivera alleges that IM status and its living conditions have caused him the following injuries: "mental illness and / or frustration of pre-existing mental illnesses / anguish / deteriorations

---

[8] Rivera also complains at length about the restrictions in his current IM-0 status. He states that he must stay in his cell twenty-three hours per day, with limited opportunities to shower; he cannot participate in religious services in person or on television and can make only a limited number of telephone calls; he cannot have contact visits, download and listen to music, or keep a razor or a mirror in his cell; his recreation occurs in a cage that is filthy with bird feces; and his food and medication must be placed in the same tray slot box where he also places his dirty laundry.

/ night terrors"; "anxiety, headaches, loss of sleep, and (to [his] belief) akathisia"; physical deterioration and weight loss; and deteriorating eyesight "due to constant exposure to extremely bright fluorescent lights in cells." (Am. Compl. ¶ 92, ECF No. 37.)

The defendants have filed Motions for Summary Judgment, which they support with copies of OP 830.A, its charts of IM and SM requirements, and its progress report forms. They also present the affidavit of Red Onion Assistant Warden J. Artrip, which describes these and other relevant procedures as well as Rivera's progress through the OP 830.A step-down procedures.

## II.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

I must draw all reasonable inferences from the facts in favor of Rivera, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis omitted) (citation omitted)). However, Rivera cannot defeat the defendants' properly supported summary judgment motion with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

B. Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation,[9] a plaintiff

---

[9] Rivera may also be contending that OP 830.A violates his substantive due process rights. Such a claim fails, however. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Rivera's claims that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d

-19-

must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Rivera does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Rivera (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Rivera makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Rivera expressly states that he is challenging, not his classification to Level S, but rather, his initial classification to IM status instead of SM status under OP

---

245, 251 (4th Cir. 2015). Therefore, I will address Rivera's complaints about the ill effects of living conditions at Red Onion separately, under the applicable legal standard for Eighth Amendment claims.

830.A and the subsequent classification adjustment decisions within that pathway.

He apparently believes that these procedures stand in his way of being released sooner from segregation to general population conditions. The defendants agree that OP 830.A "creates an expectation that 'S' level offenders will receive reviews of their classification status, particularly by the ICA." (Defs.' Mem. Supp. Summ. J. 24, ECF No. 82.) Specifically, OP 830.A(IV)(K)(5) and Appendices F and G provide that the ICA will review inmates' statuses every ninety days and decide whether to advance them to the next status level in the step-down procedures. I conclude that this periodic review policy creates a potential liberty interest for Rivera in being released from the restrictive conditions of his current security classification. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest).

I must next determine if Rivera's continued confinement in the various segregation classifications within the OP 830.A categories imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Neither party has provided me specific information about restrictive conditions, if any, dictated by the sentences to which

-21-

Rivera is subject, and I find no such sentence-related restrictions in the VDOC policies available to me. Accordingly, I will use the general population status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527 (concluding "that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence").

The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates, and even disciplinary action "in response to . . . misconduct fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S.

at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*). Moreover, "[t]he State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson,* 545 U.S. at 227. Thus, "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012).

Most importantly, the Supreme Court has consistently employed a due process analysis that encourages prisons to implement written management policies while minimizing the involvement of the federal courts "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83). "This approach . . . provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions." *Prieto*, 780 F.3d at 255. District courts must respect the Supreme Court's "judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional systems." *Id.*

In *Wilkinson*, without a point-by-point comparison of segregation and general population conditions, the Supreme Court found that inmates had a

protected liberty interest in avoiding assignment to a particular state "supermax" prison. In reaching this conclusion, the Court carefully distinguished the supermax conditions from normal segregation unit conditions on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[10] *Wilkinson*, 545 U.S. at 214. Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, once assigned to supermax, "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. The Court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32. In addition to conditions similar to those at issue in *Wilkinson*, the plaintiff in

---

[10] The conditions at the supermax at issue in *Wilkinson* included the following: "Almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. The Court noted, however, that the lack of human contact was the most distinctive of these living conditions and that the conditions were atypical when combined with the additional factors of indefinite duration and disqualification for parole. *Id.* at 224.

*Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." *Id.* at 531.

Prison policies gave rise to the indefinite terms of supermax confinement that concerned the courts in these cases. In *Wilkinson*, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. In addition, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once initially, thirty days after his arrival, and annually thereafter. *Id.* at 217. The policy at issue in *Incumaa* required review of the plaintiff's status every thirty days by an institutional classification committee ("ICC"), but that review process provided no clear criteria for him to become suitable for release from the supermax. 791 F.3d at 522-23. Assigned to the supermax as a member of a security threat group, policy provided that the plaintiff could nevertheless qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." *Id.* Policy further defined "behavior level" as including a clear disciplinary record and the ICC's evaluation of the plaintiff's overall compliance with "policies and procedures" of the institution. *Id.* at 522. In twenty years, the plaintiff had never incurred a disciplinary infraction, but the ICC repeatedly recommended his retention at the supermax without providing any behavioral basis for doing so. *Id.* at 521-23.

-25-

Without question, VDOC inmates classified to Level S, particularly those assigned IM status, are confined under highly restrictive conditions at Red Onion, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside the cell only in full restraints and with dual escorts, after a visual strip search. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh, because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Rivera contends that the conditions imposed under OP 830.A are atypical and significant, particularly IM status, because it is allegedly permanent. I find no provision in the step-down procedures to support this contention of permanence, however. Rather, OP 830.A requires review of each Level S inmate's status every ninety days and defined actions an inmate must take to be considered for status changes: participating in the step-down programming and remaining infraction free. While the policy recognizes that some inmates' crimes or other traits will require lengthy terms in some form of segregated confinement, to maintain safety and to accomplish changes in behavior characteristics, attitudes, and other factors that create the potential for extreme or deadly violence, OP 830.A does not make IM status permanent for anyone.

As Rivera's history with this procedure demonstrates, the progress an inmate makes toward less restrictive conditions rests on his choices. When Rivera worked on the *Challenge Series* and stayed infraction free, he retained or increased his privilege level. His failure to fulfill these requirements prevented his progress or resulted in backward steps. The defendants' evidence is that so long has Rivera refuses to participate in the *Challenge Series* and other expectations of OP 830.A, he will remain at IM-0 status, with its restrictive conditions and limited privileges. On the other hand, the policy and the evidence indicate that if Rivera chooses to reenroll in the step-down program, avoids disciplinary charges, and works through the *Challenge Series* books again, with the goal of changing his attitudes and thinking patterns, he can be evaluated for steps toward Level 6 and, eventually, to a general population setting.

After careful review of OP 830.A, I conclude that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate is subject to long-term, restrictive conditions, but that status need not be permanent or indefinite if the inmate chooses to participate in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted

Case 7:15-cv-00156-JPJ-RSB   Document 92   Filed 12/08/16   Page 27 of 36   Pageid#: 1736

effort to change his thinking and behavior, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP 830.A's steps allow him to make measurable progress toward reclassification to lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A, an inmate's confinement in segregation at Red Onion is, for a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

Rivera complains that any given official can purposely use OP 830.A to prolong an inmate's confinement in IM conditions. He alleges that officers have brought false disciplinary charges against him, causing him to redo an earlier step.[11] I conclude that the team assessment approach and the multi-level classification review procedures built into OP 830.A and the other VDOC policies protect against such willful action denying any one inmate the ability to move through the steps when his improvements in behavior and attitude warrant his

_____

[11] In his Counteraffidavit, Rivera asserts that several disciplinary charges he has received were false and retaliatory. His Amended Complaint, however, does not assert any § 1983 claim of retaliation, nor would I consider an amendment to add any such claim at this late stage of the litigation. A plaintiff cannot use his response to a defendant's motion for summary judgment to amend or correct a complaint challenged by that motion. *See, e.g.*, *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (holding that the plaintiff could not amend his complaint through argument in a brief opposing summary judgment). In any event, Rivera's allegations of retaliation are merely conclusory, as they do not connect the adverse actions of which he complains to his exercise of constitutionally protected rights. *See Adams v. Rice*, 40 F.3d 72, 74-75 (4th Cir. 1994) (affirming the district court's dismissal of plaintiff's claim of retaliation where the complaint "merely and conclusorily assert[ed]" that retaliation occurred).

-28-

advancement away from segregation. Moreover, if Rivera believes that procedural errors or miscalculations occurred during a classification proceeding, he can appeal the decision through the Offender Grievance Procedure, OP 830.1(IV)(G), or file a request for an interim review of his classification based on procedural or calculation errors. (OP 830.1(IV)(E).) He can also appeal any disciplinary conviction through the procedures in OP 861.1.

Rivera fails to state facts showing that confinement at Red Onion makes him ineligible to earn good conduct time or parole, which was the case for the plaintiff in *Wilkinson* while he was confined at the supermax. Rivera does not state facts indicating that he was ever eligible for parole on the sentences he is serving, and the record indicates that he has been able to earn good conduct time while in the step-down program. Moreover, I find no provision in OP 830.A itself that revokes an inmate's eligibility for discretionary parole consideration or good conduct time. Thus, I do not find that Rivera's IM status inevitably affects the length of his confinement so as to trigger a separate, constitutionally protected liberty interest in avoiding that classification. *Sandin*, 515 U.S. at 487.

For the reasons stated, I find no material fact in dispute on which Rivera can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence. Conditions there, while restrictive, can improve in defined stages based on

-29-

Rivera's own efforts toward cognitive and behavioral changes. Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections. Thus, I conclude that Rivera has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification proceedings. *Sandin*, 515 U.S. at 486-87.

Rivera has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures or other VDOC policies. Rivera raises complaints about the proceedings during which his classification was reduced to IM status and the reasons given for that change; the proceedings used and the evidence or lack of evidence cited in moving him between steps on the IM pathway; officers' alleged failures on occasion to properly document his program participation; and their alleged failures to follow review procedures at times or to consistently provide timely copies of review proceedings. However, these alleged failings are, at most, violations of VDOC policies themselves. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax,* 907 F.2d

1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Rivera's claims that one or more of them violated his constitutional rights by changing his classification under OP 830.A without due process. I will grant the Motion for Summary Judgment on Rivera's due process claims accordingly.

### C. Equal Protection.

The Equal Protection Clause[12] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show

---

[12] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Case 7:15-cv-00156-JPJ-RSB   Document 92   Filed 12/08/16   Page 31 of 36   Pageid#: 1740

that the policy is not "reasonably related to [any] legitimate penological interests." *Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.* Rivera does not state facts supporting these necessary elements of his equal protection claim.

First, Rivera has not demonstrated that he was similarly situated to inmates in SM status when officials classified him to IM status. When he was assigned to the Progressive Housing or Structured Living areas at Red Onion, he accrued disciplinary infractions that sent him back to segregation. This disciplinary history, along with his lengthy state sentence for violent offenses and his federal sentence of life for a gang-related murder, warranted treatment different from that received by inmates without such histories. Certainly, under OP 830.A's definition of IM status, the facts underlying Rivera's murder conviction could reasonably have been interpreted as indicating a propensity for extreme or deadly violence.[13]

---

[13] I cannot agree with Rivera that his criminal history does not support his IM status under the OP 830.A definition of this inmate classification.

> Evidence presented at trial established that Rivera and [codefendant] Ramirez-Guardado were members of the gang Mara Salvatrucha ("MS-13"). Rivera and Ramirez-Guardado, along with other MS-13 members, decided to kill Diaz because he was a member of a rival gang.

> To that end, Ramirez-Guardado ordered several MS-13 members, including Rivera, to drive Diaz to a local park. When the group arrived at the park, the MS-13 members stabbed Diaz as he begged for his life and attempted to

-32-

Second, Rivera does not show that he has been treated differently than any other inmate during periodic reviews for step changes. Neither Rivera nor any other Level S inmate can change his step status under OP 830.A merely by avoiding disciplinary convictions and being polite. A step change requires his progress on the *Challenge Series* curriculum and the classification officers' recognition that he is working to make positive changes in his thinking and behavior.

Third, while the OP 830.A step-down procedure purposefully treats SM and IM status inmates differently, these differences are rationally related to legitimate governmental purposes. Namely, this procedure reasonably uses the incentive of earning increased privileges and lower restrictions to encourage improved offender behavior and self-development "in a manner that maintains public, staff and offender safety." OP 830.A(I). The logical connections between the policy's provisions and the furtherance of its legitimate penological goals are self-evident.

---

defend himself. After the initial attack, Rivera noticed that Diaz was still moving and cut his throat with a steak knife.

*United States v. Rivera*, 412 F.3d 562, 565 (4th Cir. 2005). The jury also heard evidence that Rivera had told his former girlfriend, Brenda Paz, that cutting Diaz's throat was like "cutting up chicken in preparation to cook it." *Id.* Before Rivera's trial for Diaz's murder, Paz was murdered by other MS-13 members. The government presented extensive evidence of Rivera's participation in telephone calls from jail with MS-13 gang members about Paz's murder. *Id.* at 570. Rivera was convicted of murdering Diaz and sentenced to life in prison. Although Rivera was acquitted in separate proceedings of soliciting Paz's murder, the evidence presented in both cases demonstrated the depth of his involvement with the MS-13 gang.

-33-

*See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is] perhaps the most legitimate of penological goals.").

For the stated reasons, I find no material dispute of fact on which Rivera could prove an equal protection violation here. Therefore, I conclude that the defendants are entitled to summary judgment as a matter of law and will grant their motion on this claim.

### D. Eighth Amendment.

Rivera's final challenge to OP 830.A asserts that his status under OP 830.A offends the prohibition against cruel and unusual punishment of the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities";

-34-

and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Rivera's allegations do not show that he has suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion. He does not allege that he was deprived of any necessity for life, such as food or shelter. Instead, Rivera conclusorily asserts that restrictive conditions and limited privileges and socialization opportunities, along with his IM status itself, have caused him various mental and physical discomforts, such as loss of sleep and weight, vision issues, headaches, anxiety, and mental problems. He fails to present facts, however, showing that any of these health concerns qualified as a serious or significant harm, or that he needed medical care for them. For the stated reasons, I find no material dispute of fact on which Rivera could prove his claim that he has been subjected to unconstitutional conditions. Accordingly, I will grant the defendants' Motion for Summary Judgment as to his Eighth Amendment claim.

## III.

For the reasons stated, it is **ORDERED** as follows:

1. The plaintiff's motions seeking to add pages and exhibits to his Counteraffidavit (ECF Nos. 89, 90, and 91) are GRANTED; and

2. The defendants' Motions for Summary Judgment (ECF Nos. 57 and 81) are GRANTED.[14]

A separate judgment will be entered herewith.[15]

                    ENTER:   December 8, 2016

                    /s/  James P. Jones
                    United States District Judge

---

[14] It is also **ORDERED** that all claims alleged against the Virginia Department of Corrections as a defendant are DISMISSED as legally frivolous, pursuant to 28 U.S.C. § 1915A(b)(1). It is well settled that neither the Commonwealth of Virginia nor any governmental entity acting as an arm of the state, such as the VDOC, is a "person" subject to suit under § 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989).

[15] The defendants filed a Suggestion of Death as to defendant Elizabeth Thornton, Corrections Operations Administrator for the VDOC. Since substitution of a party under Rule 25 is discretionary, *see Natale v. Country Ford Ltd.,* 287 F.R.D. 135, 137 (E.D.N.Y. 2012), and since a public official's successor in office is automatically substituted as a party as to official capacity claims, Fed. R. Civ. P. 25(d), I will not hold the case open to substitute a party for the decedent.

-36-